**Mona G. GOLD, Plaintiff,**

v.

**GALLAUDET COLLEGE, et al., Defendants.**

Civ. A. No. 83–2291.

United States District Court, District of Columbia.

March 21, 1986.

engaged in employment discrimination and retaliation against her because of her sex (female) and religion (Jewish), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e, *et seq.* (1982).[1] Plaintiff's claims arise from defendant Dr. Donald V. Torr's decision to promote defendant Daniel Skripkar to director of the College's Arts and Photography Services ("APS") in August, 1982. Plaintiff contends that she was qualified for the position but was passed over because of her sex and religion, and that, following her protest of Skripkar's promotion and the manner in which it was handled, she was subjected to a series of adverse employment actions at the hands of Skripkar, Torr and other College officials. After careful review of the evidence adduced at a seven-day bench trial, the Court finds that defendants did not act on the basis of any discriminatory animus towards plaintiff in failing to promote her to director of APS, nor did defendants engage in any unlawful retaliation against her following the promotion of Skripkar to that position. Judgment will therefore be entered in favor of the defendants.

## I. *Background*

Gallaudet is a private liberal arts college for deaf students, incorporated by an act of Congress in 1857. In addition to the college facilities, Gallaudet maintains facilities for the education of hearing-impaired secondary school and elementary school students through the Model Secondary School for the Deaf ("MSSD") and the Kendall Demonstration Elementary School ("KDES"). Plaintiff, a 1969 graduate of the University of Maryland, was hired as a graphic artist by Gallaudet in 1971 and was assigned, along with all but one of the other graphic artists, to an open space in MSSD called the graphics area.

Thomas A. Mauro, Washington, D.C., Samuel Aaron Bogash, Philadelphia, Pa., Professor Conrad D. Philos and Professor Emeritus, George Mason University Law School, Arlington, Va., for plaintiff.

Lawrence T. Zimmerman, Washington, D.C., and William J. Virgulak, Jr., Fairfax, Va., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff Mona G. Gold brought this suit against Gallaudet College and certain named individuals, alleging that defendants

1. In her original complaint, plaintiff alleged causes of action under 42 U.S.C. §§ 1981, 1983, and 1985; the Fifth Amendment of the U.S. Constitution; the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.* (1982); the District of Columbia Human Rights Act of 1977, D.C.Code § 1–2501 *et seq.* (1981); and state law tort and contract theories. In an Order dated July 9, 1985, the Court struck all of plaintiff's federal causes of action, with the exception of the Title VII claims, for failure to state claims upon which relief could be granted, and declined to exercise pendent jurisdiction over plaintiff's tort and contract claims. Following an October pretrial conference, plaintiff chose not to press her claim under the District of Columbia Human Rights Act and the case proceeded to trial on her Title VII claims alone.

From 1973 through 1979, plaintiff's supervisor was Diane Adams. In her earliest evaluations of plaintiff's work, Adams graded Gold as "outstanding" in 1975 and 1976, indicating that plaintiff's potential was "exceptional" and that she "possesse[d] supervisory ability." DX G, H.[2] Beginning in 1977, however, and continuing through 1978 and 1979, Adams dropped plaintiff's performance rating from "outstanding" to "above average." She also lowered her estimation of plaintiff's potential from "exceptional" to "above average," and failed to check the box indicating that plaintiff possessed "supervisory ability." Significantly, these evaluations followed a period from October, 1975 through October, 1976 when plaintiff actually exercised supervisory authority as Adams' assistant; during this time, plaintiff managed the day-to-day operations of the art photography print shop while Adams devoted much of her time to working with architects designing a new building. In her May, 1977 evaluation, the first to follow plaintiff's tenure as her assistant, Adams wrote that Gold had "somewhat 'peaked out,' " and that her "frustrations [had] interfered with her overall performance." DX I.

In 1979, Gallaudet merged several departments, including the Department of Art and Photography, into a single unit called College Educational Resources ("CER"). CER was the brainchild of defendant Dr. Donald Torr, who was director of the College's Office of Educational Technology. The reorganization was designed to eliminate the duplication and overlap of certain educational technology services offered at the College, MSSD and KDES. Following the reorganization, Torr became director of CER, a position he held until 1984 when CER was abolished in another major reorganization at Gallaudet. As part of the reorganization itself, Torr selected William Stevens as interim director of the Department of Art and Photography (which was subsequently renamed Department of Art and Photographic Services or "APS"). At the time of his selection, Stevens was director of the Printing Department. Shortly thereafter, Torr promoted William Lewis, then a graphic artist in the department, to director of the graphic artists, reporting to Stevens. In September, 1979 Torr made Lewis director of APS in his own right; thereafter, Lewis reported directly to Torr.

Torr testified that in promoting Lewis, he did not post notice that the position was available, nor did he interview any applicants for the job. He explained that in his view, section 10:17:00 of the College's *Administration and Operations Manual* does not require job posting or interviewing when a position is filled through intra-departmental promotions; such procedures are required, Torr stated, only when a position is filled through recruitment from outside a given department. Section 10:17:00 was officially promulgated in February, 1977. Under the heading of "Recruitment," it provides for the preparation and posting of job descriptions, stating that "[s]taff positions ... must be posted for a minimum of three (3) days before a job offer can be extended to anyone and five (5) days before a job offer can be extended to anyone other than a Gallaudet employee." PX 3. Under the heading "Promotions," the regulation provides:

> The department with a job opening should consider its own people before posting the position. If a supervisor has an employee who meets the qualifications, the Personnel Requisition form should be completed and sent to the Personnel Department with the name of the employee inserted in the space provided on the requisition. *Positions that are to be filled through approved promotions will not be advertised.* All promotions must be cleared through the Personnel Office and EEO Officer.

(Emphasis supplied.) An earlier regulation, section 10:05:00, issued in December, 1971, required posting of all job vacancies, whether filled through intra-department promotion or outside recruitment, PX 8. Torr testified that he understood the 1977

---

**2.** No formal evaluations of plaintiff's work were required or prepared prior to 1975.

regulation to have superseded the earlier 1971 regulation. This understanding was subsequently confirmed by defendant La-Varne Hines, Director of Gallaudet's Administrative and Community Services and formerly the College's Director of Equal Opportunity, and by Denise Sullivan, Director of Gallaudet's Department of Human Resources.[3]

Lewis served as director of APS for ten months and in that capacity prepared plaintiff's 1980 evaluation. In that evaluation, he lowered her performance rating from "above average" to "satisfactory." He testified at trial that, in his opinion, Diane Adams had indulged a system of grade inflation, not only when rating plaintiff but for the entire staff, and that as part of his efforts to promote APS as an independent and commercially viable entity, he felt it was necessary to adjust the rating scale. He attached an explanation to that effect, along with written comments on plaintiff's work, to the 1980 evaluation. DX A. He further testified that while plaintiff could have performed the director's job, he was not particularly impressed with her work; in his opinion, she satisfied the normal requirements of her job, but, compared to the other artists in the group, he would rate her towards the low end in drawing and illustration skills, and in artistic ability generally. Indeed, he stated that, notwithstanding his adjustment of the rating system, he gave several other artists in the group higher ratings than plaintiff received. Lewis left Gallaudet in the summer of 1980 and recommended John Scott as his replacement. As Scott was not an APS employee, Torr posted the position and interviewed one other applicant in addition to Scott before appointing him director. Plaintiff did not apply for the position.

Plaintiff testified that initially at least her responsibilities increased under Scott. However, in January, 1981 he wrote her a memorandum expressing dissatisfaction with her work habits. DX F. In particular, he admonished her for her low productivity and her excessive use of the telephone during work hours, a criticism that Diane Adams had previously made in her 1979 evaluation of plaintiff. See DX K. In his memorandum, Scott stated that he would not forward a copy of the document to the Personnel Office immediately, but would instead monitor plaintiff's work closely and would forward a copy only if there were no improvement in her performance. Plaintiff responded with a lengthy memorandum of her own in which she accepted responsibility for the excessive telephone use, but took issue with Scott's charge of low productivity, his lack of firsthand knowledge of her work, his criticism of her decision to take work home with her, and his handling of the matter in general. The two met and discussed their differences and Scott agreed, as a conciliatory gesture, not to forward a copy of his memorandum to the Personnel Office. At the trial, plaintiff characterized Scott's letter to her as an act of sexual discrimination; Scott viewed it as a legitimate exercise of his supervisory authority. Plaintiff also testified that she did not consider Diane Adams' inclusion of a similar criticism in plaintiff's 1977 performance evaluation to be an act of discrimination.

In May 1981, Scott completed his first evaluation of plaintiff, rating her as "competent" overall.[4] In his written comments, he reiterated his concern that plaintiff talked on the telephone too much and was absent from her work area too often. Plaintiff was dissatisfied with the evalua-

---

**3.** Ms. Sullivan testified that the 1977 regulation superseded and rendered obsolete the 1971 regulation. She further stated that when a supervisor promotes an employee from within a department, he or she is not required to post or advertise the position or to interview applicants. Between 1981 and 1983, 99 such promotions were approved by the College's Personnel and Equal Employment Opportunity Offices. Ms.

Hines and Ms. Sullivan testified that Gallaudet's promotion and recruitment policies were fully consistent with its affirmative action plan.

**4.** In 1981, Gallaudet's evaluation forms were changed. The categories were renamed "Distinguished," "Commendable," "Competent" and "Provisional."

tion, which she viewed as lower than her past ratings, and requested a meeting with Torr and Scott to discuss it. At that meeting she raised for the first time with Torr the difficulties she felt she was having with Scott, which included, in addition to their disagreement over her work habits, Scott's decision to assign fewer theater projects to plaintiff and his refusal to let her use certain equipment called the graphic composer. At trial, she characterized these latter decisions again as acts of sexual discrimination. Scott, on the other hand, testified that he assigned the theater projects to other artists as well as to plaintiff because it was considered among the most enjoyable work available and he felt that others besides plaintiff should have an opportunity to engage in such projects; with respect to the graphic composer, he stated that the machinery was more akin to a computer than artistic equipment, and that it was more appropriate for another artist in the group to use it. At the meeting itself, Torr agreed to attach to the evaluation favorable comments about plaintiff's work from project clients; Scott's formal evaluation, however, remained unchanged.

Shortly thereafter, at her own request, plaintiff was transferred to the Learning Center, a separate building at the College. There, in addition to her graphic arts projects, she served as a liaison between faculty and students and the art department, explaining APS services and equipment to interested persons. The assignment was made in response to pressure from administration officials, who had requested that Torr locate a member of APS at the Learning Center. Torr testified that he and Scott had resisted the suggestion, viewing it as a waste of APS' already overextended resources, and had proposed hiring a junior graphics artist at a salary of around $10,000 to fill the position. When that proposal failed to gain Personnel Office approval, Scott recommended to Torr that plaintiff be transferred. Plaintiff was first assigned to the open area at the Center, but she objected to this location, citing the lack of security for her equipment. Scott rearranged the room assignments of several photographers and placed plaintiff in an office with one of them, Chun Louie.

While at the Learning Center, plaintiff filed a written grievance with Scott in June, 1982, complaining of sexual harassment by Charles Schoup, one of the photographers located at the Center. Plaintiff testified at trial that Scott investigated her complaint and put an immediate stop to Schoup's behavior. She nevertheless pointed to the episode as an act of sexual discrimination on the part of Scott, claiming that he knew of Schoup's harassment but let it continue until she complained formally.

In May, 1982 Scott completed his second and last formal evaluation of plaintiff, giving her an overall rating of "commendable," and noting in his comments that the move to the Learning Center had apparently increased her enthusiasm. Plaintiff lodged no complaints concerning this evaluation; indeed, save for his alleged failure to stop Schoup's harassment sooner than he did, plaintiff identified no further acts of sexual discrimination by Scott from the time of his first evaluation of her in May, 1981, until August, 1982, when he recommended that defendant Skripkar be appointed his successor.

### The Skripkar Appointment

In the summer of 1982, Torr and Scott discussed the possibility of creating a new position to expand and market the College's television services. Torr received approval for the position of Director of Marketing and Program Development in August and offered it to Scott. After accepting the new job, Scott recommended that Torr place APS under the supervision of William Stevens, the director of the Printing Department, rather then appoint a new director. Torr, however, rejected the suggestion and asked Scott to consider the artists in APS and to recommend one of them as his successor. Torr testified that he believed APS had become overstaffed and that he wanted to promote a director from within in order to reduce the size of the staff by one position. He stated that

Scott was the most qualified person to make such a recommendation since he was most familiar with the artists' abilities, and that he accorded Scott's views considerable weight.

Scott testified that he considered all the artists in APS for the position, whether he thought they might be interested in it or not, and that in his opinion defendant Skripkar was the only person he would recommend. His recommendation, he said, was based on his belief that the director had to be a good designer and not simply a good illustrator, someone who knew type and layout, and someone who worked well with clients and artists. He felt that Skripkar, who had been hired by William Lewis in 1980 and became a permanent full-time employee in July, 1981, possessed all these attributes. He considered plaintiff for the position but felt that she was not qualified. While her work was satisfactory to most of her clients, Scott stated that he found it uninspired, frequently sloppy, and not up to professional standards. In addition, he testified that the director of APS had to work closely with the director of the print shop, and that he knew that Stevens did not like plaintiff's work. He stated that he did not conduct an exhaustive review of plaintiff's work, or that of anyone else, nor did he base his recommendation on any established criteria, because he did not believe it was his responsibility to choose his successor. The process was informal, and his recommendation was based on the criteria, noted above, that he deemed relevant. He made his recommendation to Torr, then approached Skripkar privately to see if he was interested in the job, just as William Lewis had done with him in 1980.

Torr testified that in addition to soliciting Scott's opinion, he also considered those artists, including plaintiff, who might be interested in the position. He was aware of plaintiff's evaluations for the years 1980 through 1982, and also of William Lewis' and William Stevens' opinion of her work, and felt that she was not suited for the job. He accepted Scott's recommendation and interviewed only Skripkar before promoting him to director; he did not post the job opening or otherwise inform the APS staff of its availability. He handled Skripkar's promotion precisely as he had that of William Lewis, again based on his understanding, which he confirmed with the Personnel and EEO Offices, that posting and interviews were not necessary when making an intra-department promotion. Following the written approval of both the Personnel and EEO Offices, Torr officially announced Skripkar's promotion on August 16, 1982. Plaintiff immediately called Torr and asked to meet with him to discuss the appointment, and a meeting was held on August 17, 1982. Torr explained the basis of his decision, cited the non-posting policy, and, at plaintiff's request, set forth his reasoning in a letter to her dated August 20. DX U. At no time during the meeting did plaintiff suggest that she was protesting the promotion on grounds of sexual or religious discrimination.

### Plaintiff's Move to the Open Space

Approximately six months before he promoted Skripkar, Torr decided to convert the photographers' portrait lab at the Learning Center into a photography lab for students. Displeased with the resulting loss of space, the photographers requested a new studio shortly after Skripkar became APS director. Skripkar and Torr discussed a variety of unattractive options, among them, knocking down a wall or converting a closet into an office, and ultimately decided to move plaintiff out of her office and back into the open space at the Learning Center. Torr felt that plaintiff did not need her own private office: her function at the Center was to interact freely with students and faculty, and the other artists housed at MSSD worked in open spaces. On September 10, 1982, Skripkar informed plaintiff that she would be moved back to the open space. She wrote Torr a letter one week later, objecting to the relocation because of security problems and the difficulty of working in such a public environment. DX W. Torr responded in writing on September 22, explaining the need for studio darkroom space and suggesting

that, in light of plaintiff's concerns, he and Skripkar "must consider alternative courses of action...." DX X. In the meantime, plaintiff had raised her objections with Skripkar and had, in addition, requested that he update her job description to reflect what she viewed as her increased responsibilities at the Learning Center. Skripkar investigated plaintiff's duties at the Center and concluded that reclassification was inappropriate; he also determined that there was no way to accommodate plaintiff's request for office space while providing the needed studio room. He wrote to Torr on September 15 and recommended that, in view of increased workload at APS and plaintiff's objections to her work arrangements at the Learning Center, the best course of action would be to transfer plaintiff back to the APS work area at MSSD. DX MM.

At plaintiff's request, a meeting was held on or about September 28,[5] to discuss Skripkar's promotion and her relocation at the Learning Center. Present at the meeting were plaintiff, Torr, Skripkar, LaVarne Hines and Linda Beers, a co-worker whom plaintiff asked to attend. Torr and Skripkar discussed various options with regard to plaintiff's work space, among them, lock-up cabinets, desk covers, room dividers and moving plaintiff back to MSSD. Following this discussion, plaintiff informed those present for the first time that at some point prior to his promotion, Skripkar had referred to her as a "kike."[6] Skripkar confirmed that he had made such a remark. In a conversation with Lester Pegues, a co-worker and close friend of plaintiff's, Pegues had told Skripkar that plaintiff was being manipulative in trying to borrow money from him, and Skripkar had responded by saying that it was a "kikey" thing to do. Torr immediately reprimanded him, stating that such remarks were com-

pletely unacceptable and inappropriate; he demanded that Skripkar apologize to Gold, which he did. Hines reprimanded him as well, and informed Dr. Robert Davila, Vice President of the College, recommending that he issue a written reprimand. On October 7, Davila wrote Skripkar, warning him that such "behaviour will not be tolerated from you in the future," and that his promotion would be re-examined if he repeated such remarks. A copy of this letter was placed in Skripkar's permanent file. In the meantime, plaintiff contacted the Anti-Defamation League, which subsequently met with College officials, including Skripkar, to underscore the gravity of the remark. Skripkar testified at trial that he did not intend the statement as an ethnic slur and that he is not anti-semitic.

On October 1, 1982, plaintiff approached Patricia Potter, Director of Administrative Services, to discuss filing a grievance over Skripkar's promotion and his remark. Potter informed her that the ten-day deadline for filing such a grievance had expired. On October 25, Skripkar advised plaintiff that she would be reassigned to the graphics area at MSSD as of November 30. This arrangement was confirmed by letter dated November 3, 1982. That same day, plaintiff filed a charge with the District of Columbia Office of Human Relations ("OHR") alleging that the College had discriminated against her on the basis of sex and religion. At a fact-finding meeting with OHR on December 10, plaintiff learned, for the first time, that the reason for her proposed move was to reconsolidate all the graphic artists at MSSD. She asked LaVarne Hines if her relocation could be postponed pending resolution of the OHR charge and Hines agreed to do so.

Throughout the fall of 1982, plaintiff remained at the Learning Center, sharing an

---

**5.** The parties were unable to agree at trial whether the meeting took place on September 23 or September 28. This difference of opinion, however, is without significance and for convenience sake, the Court will refer to the meeting as the September 28 meeting.

**6.** On direct examination, plaintiff initially testified that Torr and Skripkar never discussed moving her back to MSSD until immediately after she raised the "kike" remark. On cross examination, however, she backed down from this chronology of events and admitted that the possibility of her relocation to MSSD had been discussed *before* she mentioned the remark.

office with Chun Louie. She testified at trial that during this period she saw very little of Skripkar. On January 26, 1983, Skripkar finally moved plaintiff out of her office into the open area at the Learning Center, as he had originally advised her he would do on September 10, 1982. That same day, plaintiff complained to Skripkar about the poor lighting in the open area and the lack of a lock on her cabinet. He asked the maintenance department to install a lock and improve the lighting in the area. He also had a partition installed, again at plaintiff's request. On February 8, plaintiff developed eye problems and left work early. The following day, Skripkar assigned plaintiff to MSSD on a temporary basis, since the lighting there was clearly adequate. This assignment was made permanent on March 8, when Torr learned that OHR was about to dismiss plaintiff's claim. (OHR formally dismissed the charge on March 14). Plaintiff testified at trial that her eye problems were unrelated to the lighting at the Learning Center, but were instead caused by a foreign object, thereby suggesting that her transfer to MSSD was unnecessary. In a memorandum to Skripkar dated February 11, 1983, however, she wrote that her eye strain was the result of the "very detailed nature of the work and the *absence of adequate light*," and went on to point out that she had "been informing [Skripkar] of the need for additional lighting in [her] area since January 26...." DX UU (emphasis supplied).

On March 9, the day following her permanent reassignment, plaintiff entered Skripkar's office and began shouting at him about the relocation. Her yelling was audible throughout the APS work area, and a secretary alerted Torr to the situation. Plaintiff continued shouting even after Torr arrived, and quieted down only after he threatened to fire her if she did not stop at once. At trial, she testified that she began yelling at Skripkar because he told her that she would never have been reassigned if she had "kept her mouth shut." Skripkar, on the other hand, denied making any such statement; he testified that plaintiff had entered his office shouting and

that he had responded by telling her to keep her voice down. On March 17, Torr wrote a memorandum to plaintiff advising her that he and Skripkar would no longer respond to her written memoranda (plaintiff and Skripkar had exchanged six lengthy letters between February 8 and March 15), and inviting her to proceed with her complaints through the formal grievance process. DX ZZ. On March 25, plaintiff filed a grievance with Dr. Davila. On March 29, Torr issued a written warning to plaintiff reprimanding her for her outburst in Skripkar's office. Plaintiff's grievance was terminated on April 18, 1983, when the College learned that she had contacted outside counsel to represent her.

## II. *Analysis*

### A. *The Promotion*

In *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set out the order of proof in Title VII disparate treatment cases. Plaintiff must establish a prima facie case by demonstrating: (1) that she belonged to a protected class; (2) that she applied and was qualified for an available position; (3) that she was rejected for that position; and (4) that after her rejection, the position remained open and the employer continued to seek applications from persons of similar qualifications. *Id.* at 802, 93 S.Ct. at 1824. Where plaintiff satisfies this initial showing, the burden then shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the failure to accept plaintiff for the position. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978). With respect to this showing, the defendant does not bear the burden of persuasion but rather the burden of production, *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); that is, defendants' explanation must simply raise a genuine issue of fact. *Id.* at 254–55, 101 S.Ct. at 1094–95; *McKenna v. Weinberger,* 729 F.2d 783, 788 (D.C.Cir.1984). If defendants carry this burden, plaintiff must then prove by a preponderance of the evi-

dence that the proffered reason is pretextual. *McKenna v. Weinberger*, 729 F.2d at 788. At this point plaintiff's ultimate burden of proving intentional discrimination merges with her burden of demonstrating pretext. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

■ Plaintiff satisfied her initial burden of making out a prima facie case of discrimination with respect to the promotion, although the Court notes that, notwithstanding the relatively low threshold showing required by *McDonnell Douglas*, plaintiff's prima facie case was not particularly strong. She is, of course, a Jewish female, and is thus a member of two protected classes. The evidence she offered to demonstrate her qualifications for the position, however, was less than compelling. Plaintiff offered her own opinion that she was qualified, citing the length of her employment with Gallaudet, her supervisory experience under Diane Adams, her familiarity with faculty and staff, and a host of personal attributes such as her dependability and organizational skills, and warm relationships with students, particularly in the Learning Center. But on cross-examination, she acknowledged that her supervisors did not always share that view. Adams lowered plaintiff's ratings after her stint as a supervisor, and noted that plaintiff had "peaked out"; William Lewis and John Scott rated other artists in APS higher than plaintiff; and none of her supervisors from 1977 on checked the box on her evaluation form stating that she possessed supervisory abilities. At trial plaintiff also offered the testimony of Lewis, who stated that plaintiff could have performed the job of director of APS. But Lewis himself testified that he did not like plaintiff's artistic style, that he would rank her low among the artists in APS with respect to to illustration and drawing skills, and that he gave other artists in the group higher ratings than he gave plaintiff. Given the low burden placed on plaintiff to establish a prima facie case, however, the Court is willing to accept that plaintiff was qualified for the position and that she therefore satisfied her initial burden.

Defendants also satisfied their burden of advancing a legitimate, nondiscriminatory business reason for their failure to promote plaintiff. Dr. Torr credibly testified that he wished to promote a member of APS to director in order to reduce the staff by one; that he solicited John Scott's recommendation; that he considered plaintiff, but that, based on his familiarity with her past evaluations, he viewed her as ill-suited to the job; and that he accepted Scott's recommendation and promoted Skripkar without posting the position. Plaintiff attacks this explanation as pretextual, but the Court finds no merit in any of her contentions.

Plaintiff first contends that Torr violated College promotional procedures by failing to post notice of the vacancy, and that this demonstrates his discriminatory animus. The evidence, however, is overwhelmingly to the contrary. Torr testified that the school's 1977 regulation, section 10:17:00, requires posting only when a position is filled by outside recruitment, and not by intra-departmental promotion. This is an entirely reasonable interpretation of the language of the regulation, which clearly distinguishes between internal promotions and outside recruitment, and was confirmed by both LaVarne Hines and Denise Sullivan, who indicated that over a three-year period ninety-nine promotions were carried out in exactly the same manner as Skripkar's. Even if Torr's interpretation were incorrect, and the Court does not find it is, there is no doubt that Torr genuinely thought he was acting in accordance with College policy. Not only did he confirm his understanding of the regulation with the Personnel Office, he handled two earlier male appointments in a manner completely consistent with that understanding—promoting William Lewis from within, without posting, and recruiting John Scott from outside the department, and posting the vacancy. The Court finds, therefore, that Torr acted on the basis of his good faith interpretation of College regulations, and that his failure to post notice of the vacancy in no way suggests any discriminatory animus towards plaintiff.

Plaintiff next contends that John Scott discriminated against her repeatedly on the basis of her sex, that Torr knew or should have known of the discrimination, and that Torr's reliance on Scott's recommendation was therefore discriminatory. The Court cannot agree. Scott's first alleged act of discrimination occurred when he reprimanded her for her excessive use of the telephone. Yet plaintiff, in her response to that reprimand, stated that she took "full responsibility for the extensive use of [the telephone]." DX R. In addition, she had been criticized previously by Diane Adams for precisely the same conduct in 1979. *See* DX K. Plaintiff detected no discriminatory animus in Adams' reprimand, yet cited Scott's as an act of discrimination. Moreover, Adams included her criticism in plaintiff's 1979 performance evaluation, thereby making it part of her permanent record; Scott offered to refrain from placing his letter in plaintiff's files. Finally, Scott wrote plaintiff a follow-up letter acknowledging an error in his reprimand and attached it to the original memorandum. The Court finds that the reprimand was a legitimate exercise of his supervisory authority, handled in a manner that belies plaintiff's claim of discriminatory animus.

Similarly, the Court finds no invidious motivation behind Scott's 1981 evaluation of plaintiff, his decision to assign theater projects to other artists besides plaintiff, or his refusal to allow her to use the graphic composer. While plaintiff may have been disappointed by the latter two actions, there is nothing to suggest they were discriminatory. Scott explained that plaintiff had previously garnered a disproportionate share of the available theater work, and that others in APS were interested in doing some. He did not deprive her of all such work but simply parcelled it out to more artists. Similarly, he did not punish plaintiff by denying her permission to use the graphic composer. The machine was only used by one artist in APS and even he rarely used it. Plaintiff was in no way treated differently with respect to this equipment than the other artists in the group. Finally, Scott impressed the Court

as an entirely credible witness, who, as a supervisor, held his employees to demanding standards. He stated at trial that his 1981 evaluation reflected his honest opinion of plaintiff's work, and the Court has no reason to doubt his sincerity. Indeed, Scott's estimation of plaintiff was not dissimilar to that expressed by William Lewis, both in Lewis' formal evaluations and his testimony at trial, and, as noted above, Scott's criticisms of plaintiff's work habits echoed earlier comments made by Diane Adams. Plaintiff did not include Lewis and Adams among those who had discriminated against her on the basis of sex or religion. The Court finds that Scott's similar treatment of plaintiff did not constitute discrimination either.

Finally, plaintiff claims that Scott's failure to stop Charles Schoup's harassment of her sooner than he actually did was an act of sexual discrimination. By her own account, however, Scott responded to plaintiff's grievances against Schoup and put an immediate stop to the harassment. She nevertheless argues that the two men were friends and that Scott knew of Schoup's conduct because Schoup jokingly told him about it, yet Scott did nothing to stop it until she complained. The Court cannot accept plaintiff's version of events, however, since she offered no persuasive evidence other than the supposed friendship of Schoup and Scott to support her claim that Scott quietly acquiesced in the harassment. Scott was not in the same building with plaintiff and Schoup and thus had no firsthand knowledge of their day-to-day interactions. Moreover, his prompt resolution of plaintiff's grievance is simply inconsistent with plaintiff's theory of tacit approval. Scott's explanation that he was unaware of Schoup's conduct and that he prohibited it as soon as he learned of it is far more plausible.

Having concluded that Scott harbored no discriminatory animus towards plaintiff, the Court cannot find any improper taint in his recommendation, or in Torr's reliance on that recommendation. Indeed, Torr testified credibly that Scott's assessment of

plaintiff corresponded to what he knew of her through her evaluations by Adams and Lewis, as well as through conversations with Lewis. His decision to rely on the recommendation of the APS director when promoting a member of the staff was both reasonable and consistent with his past practice (he had relied on Lewis' recommendation of Scott previously), and he had no reason to believe that that recommendation would be distorted by discriminatory bias.

Plaintiff also advances the strained theory that Torr knew or must have known of Skripkar's anti-semitic attitudes, and that the promotion of Skripkar constituted an act of religious discrimination. Plaintiff offered absolutely no evidence whatsoever to support this allegation. Indeed, despite her claims that Skripkar frequently talked behind her back before his promotion, even plaintiff, a co-worker of his, did not learn of his anti-semitic remark (uttered to her close friend) until after the promotion. There is simply no reason to suspect that Torr was aware of such comments by a person with whom he did not even work. In addition, Torr's immediate response upon learning of the "kike" remark was to reprimand Skripkar and to demand an apology. This reaction is completely consistent with Torr's testimony that he first heard about the remark at the September 28 meeting, and that he considered it unacceptable behavior.

Finally, plaintiff attempted at trial to establish a pattern or practice of discrimination against women by Torr in his hiring decisions. This contention warrants little discussion. Prior to the 1979 reorganization that Torr engineered, the College maintained separate educational technology functions at its three separate schools. Each school was under the general direction of a man, and three of the seven departmental units within the various schools were directed by women. Thus, women held three of ten supervisory positions. After the creation of OHR, there were only a total of five supervisory positions. As two of the five departments—Computer Services and Technical Support—had previously been offered only at

the College itself, the supervisors in these units, both men, retained their positions. Barbara Burkett, Director of Television Production, was replaced by a man, but this appointment was made by Dr. Gilbert Delgado, not Torr. Torr had two remaining positions to fill. He chose William Stevens over Diane Adams to head the Art and Photography and Printing Department. Three employees expressed interest in the last position, director of Instructional Design (later known as IDEC); two were men, one was a woman, Nancy Fones. Torr was unimpressed with all three and approached Paul Giesert, a Gallaudet employee who enjoyed a national reputation in the field of instructional design, to head the department. When Giesert declined, Torr took over the position himself temporarily and began recruiting nationally for someone of Giesert's national stature. Fones filed a grievance and then a complaint with OHR; before OHR rendered a decision, Fones was given the position, which she held for a year and a half before leaving voluntarily. Torr appointed Dr. Janice Richardson her successor in 1981.

In sum, then, the reorganization was a consolidation that cost three men and two women their jobs. Torr personally appointed a man over a woman for one position. With respect to the IDEC position, he passed over two men and a woman to recruit a person of national standing in the field who could have been either a man or a woman. These actions cannot be deemed discriminatory. Indeed, although Torr appointed Fones director of IDEC in response to her formal complaints, following her departure he appointed as her successor another woman, Janice Richardson, who testified that in the two years she worked for Torr, she saw no evidence that he discriminated against women, or any other group. While Torr could not be characterized as actively engaged in a program of advancing women at every available opportunity, plaintiff did not put forth evidence of a pattern or practice of sexual discrimination by Torr.

## B. Retaliation Claim

■ Plaintiff claims that following her protest of Skripkar's promotion, she suffered a series of adverse employment actions at the hands of Torr, Skripkar and others. The *McDonnell Douglas* framework is equally applicable to claims of retaliation. *McKenna v. Weinberger,* 729 F.2d at 790. Plaintiff must show (1) that she engaged in a statutorily protected activity; (2) that the employer took an adverse employment action; and (3) that there is a causal connection between the two. *Id.* If she discharges this relatively light burden, defendants must advance legitimate, nondiscriminatory reasons for the adverse actions. The burden then shifts to plaintiff to show by a preponderance of the evidence that the proffered reason is but a pretext. *Id.*

■ Plaintiff contends that she first engaged in protected activity when she protested Skripkar's appointment in August, 1982. At no point in her meeting with Torr, however, did she raise any concern that the promotion was the product of sexual discrimination. Her own testimony at trial was that she objected to the manner in which the appointment was made—that Torr had not considered her for the job or allowed her to apply—and asked where she was falling short in her work. These are the generic concerns of any disappointed employee who is passed over while a peer is promoted; airing dissatisfactions of this sort cannot be deemed statutorily protected activity, for then every questioning of a promotion would constitute an invocation of Title VII protections. *Cf. McKenna v. Weinberger,* 729 F.2d at 791 (plaintiff's superiors need not have been aware of her EEO complaint at time of her dismissal to show causal connection; it suffices that they knew of investigation *"related to sexist treatment"*) (emphasis supplied). Certainly defendant Torr, whose motivation is largely at issue here, had no reason to know that plaintiff was protesting his decision on grounds of sexual bias. The Court therefore finds that plaintiff first engaged in protected activity on September 28, when she raised the "kike" remark for the first time.

■ The adverse employment actions she claims she suffered include, among other things, her relocation into the open space at the Learning Center, the decision to move her back to MSSD, Patricia Potter's statement that the grievance she wished to file over the promotion and "kike" remark was untimely, and Torr's written reprimand following her outburst in Skripkar's office. Defendants argue that none of the listed actions are in fact adverse. The Court is willing to accept, however, that at least plaintiff's relocation to MSSD—where she would no longer enjoy her duties as APS liaison and would have to work in close proximity with a person who had disparaged her on the basis of her religion—was an adverse employment action, as was Torr's written reprimand. Her relocation to the open space at the Learning Center, on the other hand, whether adverse or not, occurred before she had engaged in any protected activity and thus cannot be the result of retaliation.[7] The Court agrees with defendants, however, that Patricia Potter's discussion with plaintiff was not an adverse employment action. Potter simply informed plaintiff that grievances must be filed within 10 days of the disputed action, and that any grievance she wished to file over Skripkar's appointment was untimely. Potter did

---

**7.** Plaintiff learned of her relocation to the open space on September 10, 1982, at least two weeks before the September 28 meeting when she first raised the "kike" remark. Even if the Court viewed this action as prima facie evidence of retaliation, defendants offered overwhelming and uncontroverted evidence of legitimate nondiscriminatory reasons for it. Months before Skripkar's promotion, Torr had decided to convert a portrait studio in the Center into a darkroom for students. The photographers were upset with the resulting loss of space and complained to Skripkar after his promotion. Torr and Skripkar considered converting a closet into an office and knocking down walls at the Learning Center, but ultimately decided that relocating plaintiff was the least objectionable and most feasible alternative. Plaintiff offered no evidence, such as other options or solutions that did not require her relocation, that in any way suggests that Torr and Skripkar's decision was pretextual.

nothing more than advise plaintiff of Gallaudet's grievance policy. Moreover, plaintiff did not need Potter's permission or approval to file her grievance, a fact that plaintiff was apparently aware of, since she had not sought any such approval prior to filing her grievance against Schoup.

Having identified at least two adverse actions that occurred not long after the September 28 meeting, plaintiff has established a prima facie showing of retaliation. Defendants, however, offered persuasive evidence of legitimate, nondiscriminatory business reasons for their actions. With respect to the decision to move plaintiff back to MSSD, Torr testified consistently on several different occasions during the course of the trial that he had never seen the need for a full-time graphic artist at the Learning Center and that he had resisted locating an artist there. When plaintiff complained about working in the open area, Skripkar recommended on September 15, well before the September 28 meeting, that plaintiff be moved back to MSSD, explaining that in view of APS' increased workload, her services could be put to better use there. DX MM. Indeed, in his September 22 letter to plaintiff, Torr had advised plaintiff that her "concerns [appear to be] so great about working in the Learning Center that [we] must consider alternate courses of action," thereby at least hinting at the possibility of moving her to MSSD. Whether or not plaintiff understood the thrust of Torr's somewhat veiled reference, the Court finds that Torr and Skripkar had seriously considered returning plaintiff to MSSD before the September 28 meeting, and that they so advised her at that meeting *before* any reference to the "kike" remark surfaced. Indeed, it is a telling comment on plaintiff's credibility in general that at trial she first testified that she, Torr and Skripkar discussed and resolved to her satisfaction the security problems associated with working in the open area at the Learning Center, and that after she raised the "kike" remark Torr immediately reopened the security issue and suggested moving her back to MSSD. The inference of retaliation in this account of the meeting is unmistakable, but on cross-examination plaintiff conceded that Torr and Skripkar discussed moving her back to MSSD prior to any discussion of Skripkar's remark. The Court also cannot credit plaintiff's self-serving statement that she was satisfied with the security measures suggested by Torr and Skripkar, which included lock-up cabinets, room dividers and desk covers. She had raised safety concerns when she was first assigned to the open area by John Scott and as a result had moved into Chun Louie's office; in her letter of September 17 to Torr she strongly objected to the relocation, citing the lack of safety and privacy, the noise, and the impossibility of locking up her belongings all the time; and following her move on January 26, 1983, into the area she continued to lodge complaints about the lighting, the heavy student traffic and the lack of safety for her equipment. In view of this steady stream of objections, and her demeanor as a witness generally, the Court simply cannot accept plaintiff's assertion that she was satisfied with makeshift measures such as room dividers and a desk cover.

In sum then, the Court concludes that Torr and Skripkar legitimately believed that a full-time artist should not be maintained at the Learning Center and that, in light of APS' increased work load and plaintiff's strenuous objections to working in the open space, the best course of action would be to move her back to MSSD. The fact that the two men had seriously considered this option well before plaintiff aired the "kike" remark further underscores the legitimacy of the decision.

Plaintiff's other evidence or allegations of retaliation warrant little discussion. She cites Skripkar's decision to move her to MSSD temporarily in February, 1983. But that action was taken only after she had complained repeatedly about the poor lighting in the open area and then left work because of an eye problem that she blamed on the poor lighting. DX UU. Prior to the temporary move, Skripkar attempted to accommodate her by ordering the installation of new lighting, as well as a cabinet lock and room dividers in her area. He testified, plausibly, that he decided to move plaintiff to MSSD while the new lights

were installed because he knew the lighting in the APS graphics area was adequate. The Court finds no retaliatory motive in these actions. Similarly, plaintiff claims that Torr's March 29 reprimand for her behavior in Skripkar's office was in retaliation for her filing a formal grievance with Dr. Davila on March 25. But in his March 17 memorandum to her, Torr had invited plaintiff to file the grievance. DX ZZ. She also claims the termination of her grievance on April 18 was retaliatory. The termination letter itself, however, explained that because plaintiff had contacted an outside lawyer, she was no longer entitled to use the Gallaudet grievance machinery as she was seeking an external remedy.

Finally, plaintiff alleges that Skripkar engaged in a general campaign of petty retaliation which consisted of giving her erroneous work instructions and reprimanding her when the work was done wrong; placing her desk near his; curtailing her contact with clients; losing her work; restricting her use of office typewriters to write memoranda to the defendants; and reacting to her minor infractions of policy with excessive harshness. Although clearly intelligent, plaintiff impressed the Court, however, as an overly sensitive person, who took offense at the slightest criticism and viewed even the most routine supervisory decisions as acts of discrimination if they affected her in a way she considered adverse. Much of what she deemed a retaliatory campaign by Skripkar simply mirrored the actions and views of her previous supervisors—Adams and Scott had warned her that she used the telephone excessively when talking to clients and others; Scott had criticized the sloppiness of her work; Lewis found her work uninspired; Adams and Scott felt she spent too much time away from her work area. The Court has no doubt that plaintiff was legitimately and justifiably concerned about working for a man who had used an opprobrious and distasteful epithet in describing her once. But Skripkar had been officially reprimanded by three of his superiors and was on notice that any further bigotry on his part would not be tolerated. Following that reprimand, his conduct was under the close supervision of Torr, a man whom the Court finds harbored no bias towards plaintiff, either on the basis of her sex or religion. Viewed objectively, the Court finds that Skripkar's behavior was not retaliatory, but was a legitimate attempt to deal with both a lack of space and a difficult employee whose work often fell short of professional standards and who could not accept criticism of even the mildest sort.

### III. *Conclusion*

For all the foregoing reasons, the Court finds that defendant Torr's failure to promote plaintiff director of APS was a legitimate business decision, and not the result of any invidious sexual or religious bias. In addition, the Court finds that while defendant Skripkar did in fact harbor religious animosity towards plaintiff, his actions following disclosure of his derogatory remark did not constitute retaliation, but were instead legitimate responses to the concurrent problems of lack of space and an overly sensitive employee who challenged the motivation behind even the most innocuous business decisions. Judgment is, therefore, by separate Order, entered this date in favor of the defendants.