John T. McFARLAND, Appellant,

v.

The GEORGE WASHINGTON
UNIVERSITY, Appellee.

No. 03–CV–633.

District of Columbia Court of Appeals.

Argued Dec. 13, 2005.

Decided Nov. 8, 2007.

338

John F. Karl, Jr., Washington, with whom William P. Farley was on the brief, for appellant.

Raymond C. Baldwin, Washington, with whom Abbey G. Hairston was on the brief, for appellee.

Before RUIZ and Fisher, Associate Judges, and TERRY, Senior Judge.*

FISHER, Associate Judge:

Appellant John T. McFarland was passed over for a promotion and eventually terminated by his former employer, The George Washington University ("GW"). He later alleged that GW had engaged in race discrimination, gender discrimination, and retaliation in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C.Code §§ 2–1401.01 *et seq.* (2001). Superior Court Judge Joan Zeldon granted summary judgment to GW on Mr. McFarland's race discrimination and gender discrimination claims, but the claim of retaliation proceeded to trial before a jury with Judge Herbert B. Dixon, Jr., presiding. After three days of trial, at the close of Mr. McFarland's case, Judge Dixon granted GW's motion for judgment as a matter of law. We affirm.

## I. The Factual and Procedural Background

### A. Mr. McFarland's Grievance

In February 1990, GW hired Mr. McFarland, an African–American man, to work in its University Accounting Services department. On August 14, 1997, he filed an informal grievance with GW's Equal Employment Activities Office ("EEA"), alleging that his male supervisor had harassed him, discriminated against him on the basis of sex, and retaliated against him for having previously written a letter of complaint regarding the supervisor. In late September 1997, Mr. McFarland sent a memorandum to the university's Vice President and Treasurer, Lou Katz, defending his job performance and complaining about his supervisor. While his EEA complaint was pending, Mr. McFarland ap-

---

* Judge Terry was an Associate Judge of the court at the time this case was argued. His status changed to Senior Judge on February 1, 2006.

plied for a position in GW's Continuing Engineering Education Program ("CEEP"), a department within the Academic Development and Continuing Education division ("ADCE"). He was hired as CEEP's Marketing Manager on September 29, 1997.

On October 15, 1997, the EEA informed Mr. McFarland that it found insufficient evidence to support his claims of discrimination and retaliation. He filed a request for a formal grievance hearing on October 28, 1997, but on November 4, 1997, the EEA denied his request.[1]

### B. The Hiring of Mattie Hunter

In August 1998, following the retirement of CEEP's director, the Associate Vice President for ADCE, Roger Whitaker, selected Mattie Hunter, an African–American woman, to be CEEP's acting director. He also appointed a search committee, consisting of five white men and two women (one white and one African–American), to find a permanent director. According to Mr. McFarland, he submitted an application for the position to the Human Resources department in November 1998. After screening twenty-four applications, the committee selected four candidates for interviews—two white men and two African–American women. At the end of the process, the committee reached full consensus that Ms. Hunter should be the new CEEP Director. On November 17, 1998, Mr. McFarland learned that the committee had selected Ms. Hunter.

### C. Elimination of Mr. McFarland's Job

Before Ms. Hunter was appointed acting director, GW had begun a strategic planning process focusing on CEEP, which was losing class enrollment and money. Between July and December 1998, CEEP had to cancel eighty-three classes due to insufficient enrollment. On February 3, 1999, Ms. Hunter, now the permanent director of CEEP, formally proposed a two-phase "departmental reorganization." She worked with Deborah McDonald in Human Resources to finalize the proposal. The first phase involved eliminating three positions, including Mr. McFarland's job as Marketing Manager; creating two new positions; and changing the responsibilities of another job within CEEP. The second phase involved integrating CEEP into a new "centralized unit which would support all departments within the [ADCE]."[2] By "reducing or eliminating duplicate staff functions," GW hoped to reduce costs. Savings in salary expenses would be directed "into CEEP's advertising in an effort to reverse declining enrollment and sustain revenues over the long term." Human Resources and Dr. Whitaker (the Associate VP for ADCE) evaluated the proposal, and it received final approval sometime after April 7, 1999.

1. On December 4, 1997, Mr. McFarland sent a letter to Lynette Chappell–Williams in the Equal Employment Activities Office requesting information and documentation about the handling of his grievance. Walter M. Bortz, Vice President for Administrative and Information Services, wrote to Mr. McFarland on January 6, 1998, stating that he had reviewed the documents associated with Mr. McFarland's request for a hearing and supported the EEA's decision to deny it. According to Mr. McFarland, he replied to Mr. Bortz on February 6, 1998, requesting "any and all" information that Bortz had reviewed in making his decision, but has received no response.

2. The "second phase" of the reorganization did not occur as Ms. Hunter had proposed. Instead, in November 1999, GW actually eliminated CEEP as an entity and merged its functions with those of three other departments within ADCE. Roger Whitaker designed and proposed this more comprehensive reorganization.

Ms. Hunter chose to eliminate the Marketing Manager position because CEEP had outsourced the direct marketing of its courses, and the contractor had assigned a marketing liaison to support those activities. Ms. Hunter testified that Mr. McFarland's remaining duties "were capable of being handled by others."

In the meantime, appellant McFarland had become suspicious of Ms. Hunter's qualifications and abilities. On April 14, 1999, after he received the job description for the director position and compared his qualifications with Ms. Hunter's, Mr. McFarland sent a letter to Human Resources, asking various questions about the tardy response to his request for the job description, Ms. Hunter's salary, and why he had not been interviewed for the position.

A few days before April 19, 1999, Ms. Hunter secured a letter from Human Resources terminating Mr. McFarland as part of the reorganization. Mr. McFarland was on leave on Thursday, April 15, and Friday, April 16, and Ms. Hunter gave the letter to him on Monday, April 19; his termination was effective immediately. On May 5, 1999, after Mr. McFarland had left GW, he received a response from Human Resources describing the process for selecting the CEEP Director and explaining that the selection committee did not recommend him for an interview "because [it] determined that your qualifications were not as strong as those of the other candidates."

### D. The Office of Human Rights Complaint and the Superior Court Civil Action

Nearly one year later, on April 10, 2000, Mr. McFarland filed a complaint with the District of Columbia Office of Human Rights ("OHR"), alleging that he "was discriminated against because of my sex and subject to an unlawful retaliation...." He did not allege discrimination based on race. Mr. McFarland represents that, on April 4, 2001, he requested that OHR administratively close its investigation. On April 5, 2001, he filed suit in the Superior Court, claiming that, in failing to promote him to the director position and eventually eliminating his position, GW (1) discriminated against him on the basis of race; (2) discriminated against him on the basis of gender; and (3) retaliated against him for complaining about discrimination. After discovery, GW moved for summary judgment. Judge Zeldon dismissed Mr. McFarland's race discrimination claim as untimely, concluding that the running of the one-year statute of limitations had not been tolled because Mr. McFarland did not allege race discrimination in his complaint to OHR. The court also ruled that Mr. McFarland had failed to make out a *prima facie* case of gender discrimination. Judge Zeldon denied GW's motion for summary judgment on the retaliation claims. After Mr. McFarland presented his evidence of retaliation at trial, Judge Dixon granted GW judgment as a matter of law.

### II. Mr. McFarland's Claims of Racial Discrimination and Gender Discrimination

▮▮▮▮ This court reviews "the grant of a motion for summary judgment *de novo.*" *Joyner v. Sibley Memorial Hospital,* 826 A.2d 362, 368 (D.C.2003). "[T]o be entitled to summary judgment, [GW] must demonstrate that there is no genuine issue of material fact and that [it is] entitled to judgment as a matter of law." *Colbert v. Georgetown University,* 641 A.2d 469, 472 (D.C.1994) (en banc) (citing Super. Ct. Civ. R. 56(c)). Although we view the evidence in the light most favorable to the party opposing the motion, "[c]onclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment." *Hollins v. Federal*

*National Mortgage Association,* 760 A.2d 563, 570 (D.C.2000) (citation omitted).

■ The DCHRA prohibits an employer from discharging or failing to promote an employee based on race, sex, or other prohibited reasons. D.C.Code § 2–1402.11(a)(1) (2001). "In considering claims of discrimination under the DCHRA, we employ the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Hollins,* 760 A.2d at 571; *Atlantic Richfield Co. v. District of Columbia Commission on Human Rights,* 515 A.2d 1095, 1099 (D.C.1986).

> In order to survive a motion for summary judgment, [the employee must] establish a prima facie case that [the employer discriminated against him]. If such a showing is made, the burden shifts to the employer to articulate a legitimate basis for [its action]. If the employer articulates a legitimate, non-discriminatory basis for the [action], the burden shifts back to the employee to demonstrate that the employer's action was pretextual.

*Blackman v. Visiting Nurses Association,* 694 A.2d 865, 868 (D.C.1997). It is the burden of production that shifts in this process. *Id.* " '[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Hollins,* 760 A.2d at 571 (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (additional internal quotation marks and citation omitted).

### A. Mr. McFarland's Claim that GW Denied Him Promotion for Discriminatory Reasons

Appellant McFarland claims that GW discriminated against him when it promoted Mattie Hunter to the position of CEEP Director in November 1998. We hold that appellant failed to establish a *prima facie* case that he was denied the promotion because of his race or his gender. Because he did not surmount the first step in the *McDonnell Douglas* procedure, the trial court properly granted summary judgment to GW.

■ To establish a *prima facie* case of discriminatory failure to promote,

> the complainant must prove four elements: (1) that [he] was a member of a protected class; (2) that [he] applied for a job for which [he] was qualified; (3) that [he] was rejected in favor of another applicant; and (4) that a substantial factor in the employment decision was [his] membership in the protected class.

■ *United Planning Organization v. District of Columbia Commission on Human Rights,* 530 A.2d 674, 677 n. 3 (D.C. 1987); *accord, Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 & n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 (D.C.1993). The *prima facie* showing requires circumstantial evidence raising an inference of purposeful discrimination. "[W]e infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that th[e] actions [of the employer] were bottomed on impermissible considerations." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 580, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). We have recognized that "[c]ourts are justifiably hesitant to throw out employment discrimination claims on summary judgment, since they almost always involve issues concerning the employer's (or supervisor's) motive or intent." *Hollins,* 760 A.2d at 570–71.

Nevertheless, if the plaintiff fails to establish a *prima facie* case, the inquiry stops and a grant of summary judgment is appropriate. *See, e.g., Chang v. Institute for Public–Private Partnerships, Inc.,* 846 A.2d 318, 324 (D.C.2004) (affirming grant of summary judgment because plaintiff failed to establish a *prima facie* case of discrimination); *Blackman,* 694 A.2d at 872 (same).

## 1. Claim of Discriminatory Failure to Promote on the Basis of Race[3]

 Mr. McFarland did not establish a *prima facie* case of racial discrimination. Most notably, he failed to establish the fourth prong of the *prima facie* test, that a substantial factor in the employment decision was his membership in the protected class. He offered no direct proof of racial animus, nor did his evidence raise an inference of discriminatory intent. Mattie Hunter, who received the promotion, is a member of the same protected class as Mr. McFarland. Because they are both African–American, Mr. McFarland has not shown that GW denied him the promotion because of his race. *See McManus v.*

*MCI Communications Corp.,* 748 A.2d 949, 955 (D.C.2000) ("Because appellant ... did not show that [the employer] replaced her with someone outside her protected class, she failed to establish a *prima facie* case of race discrimination."); *cf. St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (black plaintiff made out a *prima facie* case by showing, among other things, that after his demotion and discharge, the position was filled by a white person); *Klein v. Derwinski,* 869 F.Supp. 4, 7–8 (D.D.C.1994) (explaining that in order to make out a *prima facie* case of discriminatory termination, a plaintiff must ordinarily show the position ultimately was filled by someone not a member of the protected class). In addition, as we discuss below, Mr. McFarland did not demonstrate that he was so well-qualified for the position that the failure to select him raises an inference of discrimination.

## 2. Claim of Discriminatory Failure to Promote on the Basis of Gender

In granting summary judgment on Mr. McFarland's claim of gender discrimina-

---

3. Judge Zeldon granted GW summary judgment on appellant's race discrimination claim, concluding that he did not file it before the one-year statute of limitations expired. She held that Mr. McFarland's April 10, 2003, complaint to OHR did not toll the statute of limitations because that complaint did not allege racial discrimination. Mr. McFarland vigorously contests this conclusion, arguing that his claim of race discrimination is based on the very same facts that support his claim of gender discrimination and that his factual allegations were sufficient to put GW on notice of his claim of racial discrimination. He also invokes cases involving statutes of limitations and the relation-back of amended complaints under Super. Ct. Civ. R. 15(c). We do not resolve this issue as we affirm the judgment on the alternative ground that Mr. McFarland failed to establish a *prima facie* case of race discrimination. *See National Association of Postmasters of the United States v.*

*Hyatt Regency Washington,* 894 A.2d 471, 474 (D.C.2006) ("Where there will be no procedural unfairness, 'we may affirm a judgment on any valid ground, even if that ground was not relied upon by the trial judge or raised or considered in the trial court.' ") (citation omitted). There will be no procedural unfairness here. GW argued in its motion for summary judgment that Mr. McFarland had not established a *prima facie* case of racial discrimination, and his opposition to that motion argues that he did establish it. He thus has had a full opportunity to create a record on this issue, and the briefs submitted on appeal fully debate the existence of a *prima facie* case. "We review [the question of whether the plaintiff has established a *prima facie* case] *de novo,* applying the same standard as the trial court...." *Brown v. National Academy of Sciences,* 844 A.2d 1113, 1122 (D.C. 2004).

tion, Judge Zeldon applied a heightened standard articulated by the United States Court of Appeals for the District of Columbia Circuit—though never adopted by this court—for cases alleging "reverse discrimination." Under that standard, in order to establish a *prima facie* case, plaintiffs must show "additional background circumstances that support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Mastro v. Potomac Electric Power Co.,* 371 U.S.App. D.C. 68, 76, 447 F.3d 843, 851 (2006) (quoting *Harding v. Gray,* 9 F.3d 150, 153 (D.C.Cir.1993), and *Parker v. Baltimore & Ohio R.R. Co.,* 209 U.S.App. D.C. 215, 220, 652 F.2d 1012, 1017 (1981)).

Appellant McFarland argues that we should not adopt this standard, and that even if we do it should not apply to him, because he is an African–American man and therefore not a member of "the majority." According to Mr. McFarland, imposing "additional burdens of proof on an African–American male overlooks hundreds of years of American history and presumes that [he] occupies a privileged spot at GW because he is male." Because Mr. McFarland has failed to establish a *prima facie* case of gender discrimination even under the less-demanding traditional standard, see *supra* pages 346–47; *Arthur Young,* 631 A.2d at 361, we leave to another day the decision whether to adopt the D.C. Circuit's heightened standard for cases of reverse discrimination.[4]

 Under the second prong of the *prima facie* test, Mr. McFarland must show that he applied for and was qualified for the promotion he did not receive.[5] *See*

---

**4.** The United States District Court for the District of Columbia has applied this heightened "reverse discrimination" standard in cases where an African–American male plaintiff alleged gender discrimination. *See Hunter v. Rice,* 480 F.Supp.2d 125, 135 (D.D.C. 2007) (black man claiming gender discrimination when black female supervisor denied him a promotion); *Bryant v. Leavitt,* 475 F.Supp.2d 15, 25–26 (D.D.C.2007) (black man claiming gender discrimination when he was replaced as Director by a black woman). *But see Ware v. Billington,* 344 F.Supp.2d 63, 78–79 (D.D.C.2004) (analyzing black man's claim of gender discrimination due to adverse employment actions taken by black female supervisor with no mention of a heightened standard). The court did not discuss the propriety of applying the heightened standard to the black male plaintiffs in *Hunter v. Rice* or *Bryant v. Leavitt. See Hunter,* 480 F.Supp.2d at 135–136; *Bryant,* 475 F.Supp.2d at 25–26. We nonetheless are skeptical that the "additional background circumstances" requirement was meant to apply to the factual circumstances of this case. In *Harding v. Gray* the District of Columbia Circuit explained its rationale for applying a heightened standard in reverse discrimination cases:

> [I]n an ordinary discrimination case, in which the plaintiff is a member of a minori-

ty group, an "inference of discrimination" arises when the employer simply passes over the plaintiff for a promotion to a position for which he is qualified.... *No such inference arises when, as in this case, the plaintiff is a white man.* Invidious racial discrimination *against whites* is relatively uncommon in our society, and so there is nothing inherently suspicious in an employer's decision to promote a qualified minority applicant instead of a qualified white applicant. Thus, in order to establish a prima facie case under Title VII, *this Court requires a white plaintiff* to show additional "background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority."

9 F.3d at 153 (emphasis added) (citations omitted).

**5.** Mr. McFarland testified that he applied for the Director position in November 1998. In its answer to an interrogatory, GW acknowledged that Mr. McFarland had applied for the position, but it served a Supplemental Answer stating that it had no record that he had ever applied. GW has been unable to find a copy of Mr. McFarland's application, and he apparently did not keep a copy for his own records. When reviewing a decision granting

*Arthur Young*, 631 A.2d at 361; *United Planning Organization*, 530 A.2d at 677 n. 3. Appellant's application is not in the record, but his resume and testimony are, and they do not demonstrate that he was qualified for the position. McFarland's conclusory statements about his own qualifications are not sufficient to defeat a motion for summary judgment. *See, e.g., Hollins*, 760 A.2d at 570; *Hastie v. Henderson*, 121 F.Supp.2d 72, 81 (D.D.C.2000) (plaintiff's "own self-serving and conclusory statement" that she was more qualified not sufficient; summary judgment granted), *aff'd*, 2001 WL 793715 (D.C.Cir.2001).

■ Appellant argued that the fact that he received a Master of Business Administration degree from GW and had been working within GW for more than ten years qualified him for the Director position. The MBA degree and his familiarity with GW certainly are relevant, but they are far from sufficient. Mr. McFarland acknowledged that he had no supervisory experience before applying for the position, but the job announcement explained that the director "will supervise approximately 15 managerial and clerical employees" and that "four years of relevant experience including supervisory responsibilities [were] required." Mr. McFarland also admitted that he had never managed a budget; the job description included "oversight and expansion of approximately $4 million budget" as one of the Director's responsibilities and stated that "[p]revious budget/fiscal management experience [was] highly desirable." Because Mr. McFarland did not establish prong two of a *prima facie* case, it was appropriate to grant summary judgment

against him. *See Dunning v. Quander*, 468 F.Supp.2d 23, 30 (D.D.C.2006) (no *prima facie* case of age discrimination; plaintiff failed to show that he was qualified for the position for which he applied); *Lutes v. Goldin*, 62 F.Supp.2d 118, 127 (D.D.C.1999) (plaintiff failed to establish that he was qualified for a job upgrade, so summary judgment was appropriate).

■ Even if we assume that Mr. McFarland was minimally qualified, his qualifications do not obviously exceed those of Ms. Hunter, and the evidence thus failed to raise the necessary inference of purposeful discrimination. See page 8, *supra*. The fourth prong of our *prima facie* test requires the plaintiff to show "that a substantial factor in the employment decision was [his] membership in the protected class." *United Planning Organization*, 530 A.2d at 677 n. 3; *cf. Brown v. National Academy of Sciences*, 844 A.2d at 1123 ("that the decision not to hire her was based on the characteristic that placed her in the protected class"). One way of meeting this requirement would be to show that Mr. McFarland was much better qualified than Ms. Hunter. "If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Aka v. Washington Hospital Center*, 332 U.S.App. D.C. 256, 266, 156 F.3d 1284, 1294 (1998) (en banc). "In order to

summary judgment, we view the record in the light most favorable to the non-moving party. *Blount v. National Center for Tobacco–Free Kids*, 775 A.2d 1110, 1114 (D.C.2001); *Hollins*, 760 A.2d at 570. Moreover, GW has never defended this litigation by stating that

the reason it did not choose Mr. McFarland for the position was that he did not apply for it. Therefore, we will assume that Mr. McFarland did apply for the CEEP Director position and that he satisfies that portion of the second prong of his *prima facie* case.

justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination." *Holcomb v. Powell*, 369 U.S.App. D.C. 122, 130, 433 F.3d 889, 897 (2006) (affirming entry of summary judgment for employer on discrimination claim).

■ Mattie Hunter began working for GW in October 1997 in a part-time capacity, handling distance learning. She became a full-time employee on July 1, 1998, and served as the Director for CEEP's Records and Information Management Programs. Before joining GW, she had been self-employed as a consultant and trainer in the telecommunications industry. She previously had spent more than ten years working for MCI, becoming Senior Manager of Corporate Training and Education. In that position she supervised a staff of eight and managed and maintained oversight of departmental expense budgets. She had also worked for Avon Products for several years, becoming a Division Sales manager. She led a staff of twenty district sales managers and developed and implemented strategic and tactical plans designed to maximize sales growth. She had earned a Master's degree in Human Resources and Organization Development and had served as interim director of CEEP for approximately two months.[6] Appellant McFarland has not established that he is on the favorable side of any "qualifications gap."

■ Claiming the benefit of hindsight, appellant McFarland asserts that once she became director, Ms. Hunter proved incompetent and CEEP lost vast sums of money under her leadership.

However, neither a court nor a jury sits as a "super-personnel department that re-examines an entity's business decisions." *Holcomb*, 369 U.S.App. D.C. at 130, 433 F.3d at 897 (citations omitted). Even if we assume his allegations are true, "demonstrating discriminatory intent and pretext requires more than merely showing that the employer was mistaken." *United Planning Organization*, 530 A.2d at 679. "[I]f the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so," *Fischbach v. District of Columbia Dep't of Corrections*, 318 U.S.App. D.C. 186, 189, 86 F.3d 1180, 1183 (1996), but Mr. McFarland has made no such showing here.

Some courts would wait until step three of the *McDonnell Douglas* protocol to compare qualifications of the candidates. *See, e.g., Lathram v. Snow*, 357 U.S.App. D.C. 413, 419–20, 336 F.3d 1085, 1091–92 (2003) (reasonable jury could conclude that "there was a wide and inexplicable gulf between the qualifications" of the candidates, that plaintiff was "substantially more qualified" than person selected, and that employer's "assertions to the contrary were pretextual"); *McIntyre v. Peters*, 460 F.Supp.2d 125, 136 (D.D.C.2006); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 458, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006) ("This is not the occasion to define more precisely what standard should govern pretext claims based on superior qualifications."). *But see District of Columbia Housing Authority v. District of Columbia Office of Human Rights*, 881 A.2d 600, 615–16 (D.C.2005) (comparing qualifications of applicants in context of discussing whether plaintiff was qualified, an element

---

6. Appellant McFarland asserts that GW "preselected" Ms. Hunter for the position of CEEP Director and gave her an unfair opportunity to gain relevant experience by appointing her interim director. But, as we stated in *Howard University v. Green*, "proof of mere favor-

itism is insufficient to establish a claim of discrimination under the DCHRA...." 652 A.2d 41, 46 (D.C.1994). McFarland is required to establish that GW refused to promote him *because of* his race or *because of* his gender.

of his *prima facie* case). We do not pursue that debate here. Mr. McFarland was required to present evidence raising an inference of purposeful discrimination. He did not do so, and summary judgment was appropriate.

### 3. Claim of Discriminatory Failure to Promote on the Basis of Race and Gender in Combination

■ In his reply brief, Mr. McFarland complains that "[i]f the Office of Human Rights had conducted a thorough investigation, the agency would have realized that McFarland was the victim of discrimination as an African–American man, not just gender discrimination." At other points in the reply brief, and at oral argument, he emphasized that he is not just a man and not just an African–American, but an African–American man. He thus appears to suggest that he is a member of a "distinct protected subgroup." *See Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1034 (5th Cir. 1980) (using the language "distinct protected subgroup" to describe a similar claim by an African–American woman). This is too little, too late.[7]

A few courts have accepted this type of "intersectional" or "combination" claim in Title VII litigation. In *Jefferies* the Fifth Circuit held that black women are a "distinct protected subgroup" for purposes of the *McDonnell Douglas* test. 615 F.2d at 1034. Since then, courts in other jurisdictions have applied this holding to other Title VII cases. *See, e.g., Lam v. University of Hawaii*, 40 F.3d 1551, 1562 (9th Cir.1994) (Asian women); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416 (10th Cir. 1987) (black woman); *Jeffers v. Thompson*, 264 F.Supp.2d 314, 327 (D.Md.2003) (black

female plaintiff "established a *prima facie* case of composite, race-and-gender discrimination"); *Judge v. Marsh*, 649 F.Supp. 770, 780 (D.D.C.1986) (cautioning that "the *Jefferies* analysis is appropriately limited to employment decisions based on one protected, immutable trait or fundamental right, which are directed against individuals sharing a second protected, immutable characteristic"). We have not found a federal case where the court has squarely held that black men are a distinct subgroup for purposes of applying the anti-discrimination principles of Title VII. *See generally Sixth Annual Review of Gender and Sexuality Law*, 6 GEO. J. GENDER & L. 615, 662–64 (2005).

■ Appellant McFarland has not cited any of these cases, however, and he has made no attempt to brief this complex question. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Wagner v. Georgetown University Medical Center*, 768 A.2d 546, 554 n. 9 (D.C.2001) (citation omitted). *Accord, Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993) (questions raised but not argued in briefing are treated as abandoned); *Carducci v. Regan*, 230 U.S.App. D.C. 80, 86, 714 F.2d 171, 177 (1983) ("declin[ing] to entertain appellant's asserted but unanalyzed constitutional claim"). To the extent Mr. McFarland is attempting to argue that this court for the first time should recognize African–American men as a "distinct protected subgroup" for purposes of establishing a *prima facie* case under the DCHRA, the argument is most definitely undeveloped and perfunctory,

---

7. "[A]n argument first raised in a reply brief comes too late for appellate consideration." *District of Columbia v. Patterson*, 667 A.2d 1338, 1346 n. 18 (D.C.1995) (citing *Wilson v.* *O'Leary*, 895 F.2d 378, 384 (7th Cir.1990) ("All arguments for reversal must appear in the opening brief, so that the appellee may address them.")).

and we deem it to have been waived.[8]

### B. Mr. McFarland's Claim that GW Terminated Him for Discriminatory Reasons

Appellant McFarland claims that GW engaged in unlawful discrimination when it terminated him on April 19, 1999. He did not produce any direct evidence of discriminatory animus, so this claim must also proceed through the three steps of the *McDonnell Douglas* protocol. See *supra* page 346; *Hollins,* 760 A.2d at 571. We conclude that Mr. McFarland failed to establish a *prima facie* case of discriminatory termination based on race or gender. Alternatively, he has provided no evidence to show that GW's proffered reason for terminating him was a pretext for impermissible discrimination.

### 1. Mr. McFarland Did Not Establish a *Prima Facie* Case of Discriminatory Termination Based on Race or Gender

 To establish a *prima facie* case of discriminatory termination, a plaintiff generally must demonstrate "(1) that he was a member of a protected class, (2) that he was qualified for the job from which he was terminated, (3) that his termination occurred despite his employment qualifications, and (4) that a substantial factor in his termination was his membership in the protected class." *Hollins,* 760 A.2d at 572; accord, *McManus,* 748 A.2d at 954; *Blackman,* 694 A.2d at 868–69. In a situation like Mr. McFarland's, when an employee is not replaced because his job is eliminated, the fourth ("substantial factor") prong of the *prima facie* showing is tailored to the circumstances. "In making a *prima facie* case of employment discrimination in the absence of an allegation that someone had replaced [him] in the same job, appellant would be required to show that the jobs of one or more persons who were not members of the protected class, *and who had jobs similar to* [*his* ], had not been terminated." *McManus,* 748 A.2d at 954 n. 5 (emphasis added); see *Boulton,* 808 A.2d at 503 (quoting *McManus* ); *O'Donnell v. Associated General Contractors of America, Inc.,* 645 A.2d 1084, 1088 (D.C.1994) (plaintiff who was not replaced must "show that persons who were not members of the protected class and were similarly situated to appellant, were not terminated"); see also *Gragg v. Somerset Technical College,* 373 F.3d 763, 767–68 (6th Cir.2004) (in a reduction in force case, plaintiff must produce "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons" (internal quotation marks and citation omitted)); *Udo v. Tomes,* 54 F.3d 9, 12 (1st Cir.1995)

---

8. This court has yet to decide whether it would recognize "distinct protected subgroups" when evaluating employment discrimination claims. *See McManus,* 748 A.2d at 957 ("we understand appellant to be arguing that, because of her choice of clothing and hairstyle, she represents a subset of African–Americans whose claim of discrimination based on race, coupled with personal appearance, cannot be defeated by hiring to replace her an African–American whose dress more typically reflects corporate America. While there may be circumstances in which such a claim of discrimination would be legally cognizable, appellant has not proffered facts sufficient to support such a claim here ....."); see also *Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP,* 799 A.2d 381, 385 (D.C.2002) (married African–American plaintiff claimed discrimination based on race and marital status because two white, childless associates were hired after she was terminated; without discussing the cognizability of distinct protected subgroups, we assumed plaintiff had established a *prima facie* case based on race and marital status in combination, but nevertheless upheld the trial court's decision granting summary judgment against her).

(in reduction in force cases, fourth prong is met by showing "that the employer either did not treat members of the protected class neutrally or retained persons not within the protected class *in the same position*" (emphasis added)).

■■■■ Mr. McFarland cannot establish that GW treated other employees who "had jobs similar to his" (or who were "similarly situated") more favorably than himself. To show that employees are similarly situated, the plaintiff must "demonstrate that all of the relevant aspects of [their] employment situation[s][are] nearly identical." *Neuren v. Adduci, Mastriani, Meeks & Schill,* 310 U.S.App. D.C. 82, 89, 43 F.3d 1507, 1514 (1995); *accord, McDonald v. Village of Winnetka,* 371 F.3d 992, 1002–03 (7th Cir.2004); *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53–54 (2d Cir.2001); *Conward v. Cambridge School Committee,* 171 F.3d 12, 20–22 (1st Cir. 1999). Differences in job title, responsibilities, education, experience, and work record can be used to determine whether two employees are similarly situated. *Leadbetter v. Gilley,* 385 F.3d 683, 691 (6th Cir.2004); *Zaccagnini v. Chas. Levy Circulating Co.,* 338 F.3d 672, 675–76 (7th Cir.2003); *see O'Donnell,* 645 A.2d at 1089 (holding that a female employee failed to establish she was similarly situated to male employees where there was disparity between them in years of service and employment disciplinary record).

Because CEEP was losing money, its management recommended a two-phase departmental reorganization that would improve efficiency and "redeploy" resources from administrative functions to "revenue generating activities," and it chose to eliminate McFarland's Marketing Manager position in the first phase. His was the only such position in CEEP, so he cannot demonstrate that GW retained in the same position persons who were outside his protected class.

Mr. McFarland's position was selected for elimination because most of the marketing responsibilities for CEEP had been outsourced before the total absorption of CEEP's activities that took place in November 1999. GW explained that it eliminated Mr. McFarland's position earlier than November 1999 to "aid in [the] effort to reach revenue and profit goals for the 1999 fiscal year without completely disrupting departmental operations." At her deposition, Ms. Hunter explained, "CEEP was hemorrhaging money every day and we needed to make some changes in order to try and curb that as much as possible." No inference of discrimination arises from the decision to eliminate that particular position or to do so in April rather than in November.

■■■ Nevertheless, appellant McFarland seems to complain that the manner of his termination demonstrates discrimination. The two other employees whose positions were slated for elimination in April were white women, and he alleges that they were given preferential treatment. One woman resigned shortly before (and apparently without knowing that) she was to be terminated. In her resignation letter, dated April 13, she stated that her last day of work would be April 29th or 30th. Knowing of her imminent departure, Ms. Hunter did not eliminate her position until after she left. By contrast, Mr. McFarland's termination on April 19 was effective immediately. The other woman applied for and obtained a different position at CEEP. Thus, Mr. McFarland asserts that her job was not in fact eliminated.

These two women were not similarly situated to Mr. McFarland. Their position titles were different, as were their duties, which included ordering office supplies, providing computer and system support,

and providing implementation assistance to the Program Manager for Contracts. Moreover, Mr. McFarland asks us to infer too much from these circumstances, which do not satisfy prong four of a *prima facie* case—showing that a substantial factor in Mr. McFarland's termination was his membership in a protected class.

 Finally, because his remaining job duties were redistributed to Mattie Hunter, a black woman, and to Troy Teeboom, a white man, Mr. McFarland argues that he was effectively fired and "replaced" by two people who were not members of his protected class. Depending on the circumstances, an " 'inference of discrimination [may] arise[] from the fact that [the plaintiff was] constructively "replaced" by workers outside of the protected class.' " *Boulton,* 808 A.2d at 503 n. 5 (quoting *Bellaver v. Quanex Corp./Nichols–Homeshield,* 200 F.3d 485, 495 (7th Cir.2000)). An inference of discrimination is most natural when the plaintiff's job has not really been eliminated, but instead filled by others outside his protected class. Here, however, Mr. McFarland's most important duties were eliminated as redundant-they were being performed by the outside marketing contractor. Although some remaining duties still had to be performed within CEEP, they were absorbed by current employees, allowing GW to save costs by eliminating his position. Without evidence that it had a discriminatory motive, GW's decision to out-source a function previously performed in-house is a legitimate goal of a reduction in force. Moreover, Ms. Hunter is a member of the same race, and Mr. Teeboom is of the same gender. Reassigning duties to them does not raise a legitimate inference of discrimination based on race or gender. (We have explained above why Mr. McFarland has not properly raised a claim of "intersectional" or "combination" discrimination.)

In sum, the circumstantial evidence cited by Mr. McFarland does not raise an inference of purposeful discrimination in eliminating his job. See page 8, *supra.*

## 2. Even if Mr. McFarland Could Establish a *Prima Facie* Case of Discriminatory Termination, He Has Not Shown that GW's Legitimate Reasons for his Termination Were Pretextual

 At step two of the *McDonnell Douglas* process, the burden of production shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the employment action." *Hollins,* 760 A.2d at 571 (internal citation and quotation omitted). "The employer can 'satisfy its burden by producing admissible evidence from which the trier of fact [can] rationally conclude that the employment action [was not] motivated by discriminatory animus.' " *Id.* (quoting *Atlantic Richfield,* 515 A.2d at 1099–1100). GW has satisfied its burden under part two of the *McDonnell Douglas* test by providing copious documentation of the reorganization which eliminated Mr. McFarland's position.

Because GW articulated a nondiscriminatory reason for the employment action, "the burden shifts back to the employee to prove, again by a preponderance of the evidence, that the employer's stated justification for its action was not its true reason but was in fact merely a pretext to disguise discriminatory practice." *Hollins,* 760 A.2d at 571 (internal citation and quotation omitted). We have explained the burden on the employee at this third step:

> [O]nce the employer has met its burden of producing a legitimate, non-discriminatory reason for the termination, the presumption "drops from the case." *Burdine,* 450 U.S. at 255 & n. 10, 101

S.Ct. 1089. From that point onward, the employee must show *"both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center*, 509 U.S. at 515, 113 S.Ct. 2742 (emphasis in the original).

*Hollins*, 760 A.2d at 571. Therefore, Mr. McFarland must present evidence showing not only that GW's stated reason for his termination was a pretext, but also that it was "a pretext for terminating him *because of his race*" or his gender. *Id.* at 573 (emphasis in original). For the reasons already discussed, we conclude that Mr. McFarland has not shown that GW's reason was a pretext for discrimination. Therefore, summary judgment was appropriate on this alternative ground. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."); *Hollins*, 760 A.2d at 574 (even if the employee claiming race discrimination could show "direct evidence of pretext" because the employer based the termination on a flawed investigation, "it would still not be sufficient to get [the employee] beyond summary judgment without some evidence from which one could justifiably infer that discrimination was the more likely reason for his termination.").

### C. Conclusion Affirming Grant of Summary Judgment

For the foregoing reasons, we affirm the decision to grant summary judgment to GW on Mr. McFarland's claims of discriminatory failure to promote and discriminatory termination.

### III. Mr. McFarland's Claims of Retaliation

After appellant McFarland presented his evidence of retaliation during three days of trial, Judge Dixon entered judgment against him. When evaluating appellant's arguments that this ruling was error, we will consider only the evidence presented to the jury. We discern no error and affirm.

### A. Legal Principles and Standard of Review

 "We review [the granting of] a motion for judgment as a matter of law by applying the same standard as the trial court." *Majeska v. District of Columbia,* 812 A.2d 948, 950 (D.C.2002) (citing *Pazmino v. Washington Metro. Area Transit Auth.,* 638 A.2d 677, 678 (D.C.1994)). "A [judgment as a matter of law] is proper only if there is no evidentiary foundation, including all rational inferences from the evidence, by which a reasonable juror could find for the party opposing the motion, considering all the evidence in the light most favorable to that party." *Id.* (quoting *Pazmino,* 638 A.2d at 678). "When viewing the evidence, the court must take care to avoid weighing the evidence, passing on the credibility of witnesses or substituting its judgment for that of the jury. If it is possible to derive conflicting inferences from the evidence, the trial judge should allow the case to go to the jury." *Id.* (citations and internal quotation marks omitted). "The jury, however, may not be allowed to engage in idle speculation. Speculation is not the province of a jury, for the courts of this jurisdiction have emphasized the distinction between the logical deduction and mere conjecture." *Id.* (quoting *Jones v. Safeway Stores, Inc.,* 314 A.2d 459, 460–61 (D.C.1974)).

 Under the DCHRA, it is an unlawful discriminatory practice "to ... re-

taliate against ... any person ... on account of having exercised ... any right granted or protected under this chapter." D.C.Code § 2–1402.61(a) (2001). "To make out a prima facie case of retaliation, the plaintiff must establish: (1)[he] was engaged in a protected activity, or that [he] opposed practices made unlawful by the DCHRA; (2) the employer took an adverse personnel action against [him]; and (3) a causal connection existed between the two." *Howard University v. Green,* 652 A.2d 41, 45 (D.C.1994). Mr. McFarland asserts that he was denied promotion and was terminated in retaliation for filing the August 14, 1997, grievance with the EEA; he also claims that his termination was in retaliation for sending the April 14, 1999, letter to the Human Resources department requesting information about the process used to select the new CEEP Director.

"Whether actions by an employee constitute protected activity is a question of law, and we therefore review the trial courts' conclusions *de novo.*" *Carter–Obayuwana v. Howard University,* 764 A.2d 779, 790 (D.C.2001) (citing *Green,* 652 A.2d at 45–47). "Protected activity need not take the form of a lawsuit or of a formal complaint to an enforcement agency.... [It] extend[s] to an employee's informal complaints of discrimination to his or her superiors within the organization." *Carter–Obayuwana,* 764 A.2d at 790–91.

**B. Mr. McFarland Did Not Establish a *Prima Facie* Case that He Was Denied Promotion or Was Terminated in Retaliation for Filing his August 1997 Grievance with EEA**

**1. Mr. McFarland Engaged in Protected Activity by Filing his August 1997 Grievance**

When appellant McFarland filed his grievance with the EEA in 1997, he specifically alleged that his male supervisor harassed him, discriminated against him on the basis of sex, and retaliated against him for an earlier complaint. Filing that grievance constituted protected activity and established the first prong of a *prima facie* case of retaliation. *See, e.g., Carter–Obayuwana,* 764 A.2d at 791. There is no dispute that the second prong of a *prima facie* case has been established—that an adverse personnel action was taken.

**2. There Is No Evidence of a Causal Connection Between the August 1997 Grievance and GW's Actions**

However, Mr. McFarland failed to establish a causal connection between his filing of the 1997 grievance and GW's failure to promote him in 1998 or its decision to terminate him in 1999. For purposes of meeting the requirement of a *prima facie* case, "[t]he causal connection ... may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Arthur Young,* 631 A.2d at 368 (quoting *Mitchell v. Baldrige,* 245 U.S.App. D.C. 60, 66, 759 F.2d 80, 86 (1985)). "Employer awareness that the employee is engaged in protected activity is ... essential to making out a prima facie case for retaliation." *Green,* 652 A.2d at 46.

Mr. McFarland argues that the jury was entitled to draw inferences of causation from the sequence of events— that he was denied promotion in November 1998 and terminated in April 1999 after filing his August 1997 grievance—but tracing the sequence quickly exposes an inconvenient fact. *After* he had filed his August 1997 discrimination complaint,

McFarland was promoted to the position of Marketing Manager (in September 1997). It is highly improbable that an employer so offended by an employee's complaint as to fire him in retaliation would first promote him. *See Brady v. Houston Independent School District,* 113 F.3d 1419, 1424 (5th Cir.1997) (that a plaintiff was promoted after filing a complaint of discrimination is "utterly inconsistent with an inference of retaliation").

Even more damaging (indeed, fatal) to appellant McFarland's theory is the complete absence of evidence showing that any individual responsible for either hiring Ms. Hunter in 1998 or terminating Mr. McFarland in 1999 knew about the August 1997 grievance. As we have said, "[i]t simply defies logic to charge an employer with acting in retaliation for an action of which the employer was not, in fact, made aware." *Green,* 652 A.2d at 48.

 Lacking evidence that the individuals who made the adverse personnel decisions knew of his protected activity, Mr. McFarland argues that this court should impute knowledge to the institution as a whole. His argument is inconsistent with the prevailing federal view that, in order to establish the element of causation in a *retaliation* claim, an employee must show that the decision-makers responsible for the adverse action had actual knowledge of the protected activity. *See Brungart v. BellSouth Telecommunications, Inc.,* 231 F.3d 791, 800 (11th Cir.2000) (rejecting imputed knowledge theory; "[T]he fact the employer is a corporation does not relieve a plaintiff of the burden of showing a causal connection between the protected conduct and the decision to take the adverse employment action."); *see also Raad v. Fairbanks North Star Borough School District,* 323 F.3d 1185, 1197–98 (9th Cir. 2003) (decision-maker must have knowl-

edge of protected activity to find an employment action retaliatory); *Gupta v. Florida Board of Regents,* 212 F.3d 571, 590 (11th Cir.2000) ("To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated.") (citations, internal brackets, and quotation marks omitted); *Sanchez v. Denver Public Schools,* 164 F.3d 527, 533–34 (10th Cir.1998) (plaintiff failed to establish a *prima facie* case of retaliation because there was no evidence that the decision-maker knew of the plaintiff's protected conduct).

The United States Court of Appeals for the Seventh Circuit has explained that "[i]t is not sufficient that [the defendant] *could* or even *should* have known about [the plaintiff's] complaints; [the decision-maker] must have had actual knowledge of the complaints for her decisions to be retaliatory." *Luckie v. Ameritech Corp.,* 389 F.3d 708, 715 (7th Cir.2004) (emphasis in original). *Accord, Tomanovich v. City of Indianapolis & Indiana Dep't of Transportation,* 457 F.3d 656, 669 (7th Cir.2006) ("[I]f an employer did not know the plaintiff made any complaints, it cannot be trying to penalize him for making them." (internal quotation marks and citation omitted)). The Seventh Circuit's reasoning that an employer cannot take actions against an employee *in retaliation for* that employee's protected activity without first having *knowledge* of that activity echoes our reasoning in *Green.* Although we have not specifically ruled on the issue of individual knowledge in the context of employment discrimination, our decision in *Jung v. George Washington University,* 875 A.2d 95 (D.C.2005), is fully consistent with *Luckie* and the prevailing federal view, and it foreshadows our decision here.[9]

---

**9.** We amended the *Jung* opinion on rehearing, but that amendment did not affect the portion

In *Jung,* a Ph.D. candidate failed his comprehensive oral examination, which was conducted before a panel of professors less than a year after he settled a race discrimination suit against the university. *Id.* at 101. Jung then sued the university under the DCHRA, claiming that the professors failed him in retaliation for his previous discrimination suit. *Id.* We upheld the trial court's decision granting judgment for the university as a matter of law because the student failed to establish a causal connection between his protected activity and his poor marks on the exam. There was uncontradicted testimony that the professors administering and evaluating the exam had no knowledge of the prior lawsuit. *Id.* at 113–14 (citing *Green,* 652 A.2d at 46). Although *Jung* is not an employment case, it solidly supports the general principle that the plaintiff must provide evidence that the decision-makers who took the adverse action knew about his protected activity. *Jung,* 875 A.2d at 113. To hold otherwise would invite speculation about the very essence of a retaliation claim—the motivational link between the adverse action and the protected activity.

In evaluating Judge Dixon's decision to grant judgment as a matter of law, we must look solely to the evidence presented to the jury (and reasonable inferences drawn therefrom). Appellant McFarland offered no evidence that any of the seven members of the selection committee involved in hiring Mattie Hunter knew about his August 1997 grievance. He called only two of them at trial but did not ask Caroline James whether she knew about his grievance. Roger Whitaker denied knowing of that grievance, and there was no contradictory evidence.[10]

Appellant McFarland offers an alternative theory that would make knowledge of the decision-makers irrelevant. He testified that he submitted his application to the Human Resources department, and he asserts in his brief that Deborah McDonald and Tom Rogers of that department knew of the letter he sent to Treasurer Lou Katz in September 1997 in connection with the August grievance. According to Mr. McFarland, a jury could find that McDonald and Rogers knew about the grievance. He then links this "knowledge" to GW's inability to produce his application. As presented at oral argument, Mr. McFarland basically is suggesting that *someone* behind the scenes at GW "deep-sixed" his application for the

---

of the decision we discuss here. *See Jung v. George Washington University,* 883 A.2d 104 (D.C.2005).

**10.** McFarland attempts to establish a causal connection by arguing that GW's retaliatory actions (failure to promote him in November 1998 and termination in April 1999) happened "shortly after" he engaged in protected activity. *See, e.g., Arthur Young,* 631 A.2d at 368. To shorten the time span, he asserts that his August 1997 grievance is "ongoing" protected activity because he wrote to Walter Bortz on February 6, 1998, regarding the grievance and is still awaiting a response. See note 1, *supra.* Mr. McFarland misplaces his reliance on this theory of circumstantial proof. He first must show that the decision-makers had knowledge of the protected activity. *Arthur Young,* 631 A.2d at 368 ("[t]he causal connection . . . may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."); *Green,* 652 A.2d at 46 ("Employer awareness that the employee is engaged in protected activity is . . . *essential* to making out a prima facie case for retaliation." (emphasis added)). As we have demonstrated, they did not. Moreover, his argument that the protected activity is still ongoing is far-fetched, and, viewed in the context of all the evidence, any inference of causation based on a "shortly after" theory is impermissibly speculative.

position of CEEP Director, and did so in retaliation for his August 1997 complaint.

There are many problems with this theory. For example, Ms. McDonald testified that she did not know about the August grievance, and she did not remember the September letter.[11] McFarland presented no evidence that Rogers knew about either the August grievance or the September letter. Moreover, McFarland simply assumes that his application never reached the selection committee because one of the two members he called did not remember seeing it (the other member was not asked), and because GW could not produce the application in discovery. (Of course, McFarland could not produce a copy either.) GW's record keeping may leave something to be desired, but there is no evidence to establish that someone behind the scenes prevented the selection committee from considering McFarland's application.

Our review is "disciplined by the consideration that where plaintiff's evidence invites the jury to speculate as to negligence or causation a directed verdict is properly granted." *Jimenez v. Hawk,* 683 A.2d 457, 461 (D.C.1996) (citing *Pepsi Cola Co. v. Waddell,* 304 A.2d 630, 632 (D.C.1973)). Here, Mr. McFarland's alternative theory of causation is the nebulous hypothesis that "someone" took action to prevent him from being considered by the selection committee. Without more, this is simply too shaky a platform to support a retaliation claim. "[A] jury should never be permitted to guess as to a material element of the case such as damages, negligence, or causation." *Jimenez,* 683 A.2d at 461–62 (internal quotation marks and citation omitted). Even viewing the evidence in

the light most favorable to Mr. McFarland, it is far too speculative to infer that someone, either acting alone or in conspiracy with someone else in Human Resources, intentionally failed to pass on Mr. McFarland's application to the search committee and did so in retaliation for the August 1997 complaint.

**C. Mr. McFarland Did Not Establish a *Prima Facie* Case that He Was Terminated in Retaliation for Writing his April 14, 1999, Letter to Tom Rogers**

**1. Was Mr. McFarland's April 14, 1999, Letter Protected Activity?**

In order for activity to qualify as "protected," a plaintiff "is required to 'alert the employer [and make the employer aware of the fact] that [he or] she is lodging a complaint about allegedly discriminatory conduct.'" *Carter–Obayuwana,* 764 A.2d at 791 (quoting *Green,* 652 A.2d at 46) (editing in *Carter–Obayuwana* ). "The employee need not ... employ any 'magic words' such as 'discrimination,' for 'the communication of a complaint of unlawful discrimination ... may be *inferred* or *implied*' from the surrounding facts." *Id.* (quoting *Green,* 652 A.2d at 47). However, " '[t]he onus is on the employee to clearly voice [his] opposition to receive the protections provided by the Act'; general complaints about 'workplace favoritism' or other conduct not actionable under the DCHRA do not put the employer on the required notice." *Daka, Inc. v. McCrae,* 839 A.2d 682, 690 (D.C.2003) (quoting *Green,* 652 A.2d at 48).

Mr. McFarland's April 14, 1999, letter did ask questions about the CEEP Di-

---

11. Ms. McDonald was not involved in handling the grievance. Mr. McFarland testified: "I also sent a copy of the letter to Deborah McDonald because Deborah McDonald was the individual who was cc'd on the letter that I received while I was working in Accounting Services."

rector position and why he had not been interviewed. The letter also contained several questions which might be interpreted as indicating that Mr. McFarland was disappointed that GW had not promoted him. However, the letter does not allege discrimination or retaliation of any kind, it does not assert any facts that would support an allegation of that nature, and it does not refer to any of his previous complaints to EEA. Even if Mr. McFarland's letter is read as signaling a general dissatisfaction with the fact that he was passed over for the promotion, it does not clearly complain about unlawful discrimination.[12] Indeed, it is far from clear that the letter is complaining about anything at all.[13]

We recognize that engaging in protected activity under the DCHRA does not require the recitation of "magic words," but alleging discrimination is so easily accomplished that we need not sweep in "the generic concerns of any disappointed employee who is passed over while a peer is promoted...." *Gold v. Gallaudet College,* 630 F.Supp. 1176, 1187 (D.D.C.1986). This reasoning is particularly compelling in this case, given that Mr. McFarland, having previously filed a discrimination and retaliation complaint with the EEA, certainly knew how to do so.[14] However, we need not finally decide whether we agree with Judge Dixon's legal conclusion that the letter did not constitute protected activity, because, as we now discuss, there was no causal connection between the letter and the decision to terminate appellant.

## 2. Mr. McFarland Failed to Establish a Causal Link Between the Letter and GW's Actions

■■■ Mr. McFarland claims that Deborah McDonald's role in his termination creates a genuine issue of material fact because she possibly knew of his April 14, 1999, letter. This argument has no merit.

12. Even vociferously expressing dissatisfaction has been found insufficient unless the complaint alleges a discriminatory practice. *See generally Miller v. American Family Mutual Insurance Co.,* 203 F.3d 997, 1008 (7th Cir.2000) (voicing general displeasure with being paid less than her co-workers given the employee's longer tenure and fact that she trained some of them did not amount to protected activity of complaining about pregnancy discrimination); *Aldridge v. Tougaloo College,* 847 F.Supp. 480, 485 (S.D.Miss.1994) (prior grievance complaining that female boss had not properly noticed job vacancy and had treated female plaintiff unfairly held insufficient to constitute protected activity of complaining about sex discrimination).

13. Although Mr. McFarland sent a copy of his April 14 letter to Lynette Chappell–Williams of the EEA, this choice of a secondary addressee does not by itself transform the letter from a general inquiry into a complaint of discrimination. We similarly reject Mr. McFarland's argument that Tom Rogers' response on May 5, 1999, "concedes GW recognized that McFarland was complaining about discrimination...." The May 5 letter is a straightforward attempt to respond to the questions posed by Mr. McFarland. It does not treat McFarland's inquiry as a complaint about discrimination.

14. We reject Mr. McFarland's argument that fealty to the "law of the case doctrine" required Judge Dixon to consider the letter "protected activity." According to Mr. McFarland, GW conceded that the letter was protected activity in its Motion for Summary Judgment, and Judge Zeldon "adopted GW's concession and ruled the April 14, 1999 memorandum was 'protected activity.'" However, GW never conceded that the letter was protected activity; its motion simply stated that GW *"assumes for the purposes of this motion only* that the April 14, 1999 letter constitutes protected activity.... GW makes this assumption in the interest of brevity and because, even assuming the letter constitutes protected activity, Plaintiff cannot make out a *prima facie* case of retaliation." Judge Zeldon did not rule on the issue, but merely assumed the letter constituted protected activity prior to granting summary judgment against Mr. McFarland on other grounds.

Ms. McDonald testified that she consulted on the proposal to eliminate McFarland's position, and she drafted the letter informing him of his termination, but she was not aware of his April 14 letter to Rogers. It is not clear how many days before April 19 Deborah McDonald provided the draft termination letter to Ms. Hunter, but there could be no rational inference that Ms. McDonald learned of the letter and, in reaction, it somehow influenced the decision to eliminate Mr. McFarland's position. That decision was made before McFarland wrote his letter.

At oral argument, counsel for appellant conceded that Ms. Hunter had no knowledge of Mr. McFarland's complaints at the time she decided to eliminate his position. Ms. Hunter formally proposed that step in a February 3, 1999, memo and had met with the HR department about eliminating Mr. McFarland's Marketing Manager position as early as January of 1999. Although final approval was given shortly before Mr. McFarland was notified that his position had been eliminated, it would be speculation to suggest that that decision was influenced by knowledge of the April 14 letter.

### D. Conclusion Affirming Grant of Judgment As a Matter of Law

Because appellant McFarland produced no evidence that the decision-makers knew he had filed a grievance in 1997, he failed to prove that they denied him a promotion or eliminated his job in retaliation for that protected activity. Even assuming for the sake of argument that McFarland's April 14, 1999, inquiry constituted protected activity, a jury would have to speculate in order to find a causal link between that letter and the decision to eliminate McFarland's job. Therefore, Judge Dixon properly granted GW's motion for judgment as a matter of law. *See Majeska,* 812 A.2d at 950.

### IV. Judge Dixon's Order Limiting the Introduction of Certain Evidence

Mr. McFarland also argued that the so-called reduction in force ("RIF") at CEEP in April 1999 was a pretext for eliminating his position, because a "real" RIF did not occur in ADCE (the larger division of which CEEP was a department) until November 1999. Granting GW's motion *in limine,* Judge Dixon excluded evidence of "facts surrounding any termination that occurred or did not occur concerning employees in any other department of the ADCE Division or any other Department or Division of the University." However, Judge Dixon also ruled that Mr. McFarland could offer evidence of "facts surrounding any termination that occurred or did not occur concerning employees in the [CEEP] ... during April 1999 *and* October 1999 ..." (emphasis in original). Mr. McFarland characterizes the first ruling as effectively dismissing his second theory of liability, in which he claimed that GW retaliated by terminating him in April 1999 rather than in November 1999 pursuant to the "real" RIF.

This "early RIF" argument is not a distinct theory of liability at all-it is merely a recasting of Mr. McFarland's retaliation claim. Even assuming that GW did expedite his termination, all Mr. McFarland would have shown is that GW was eager to get rid of him; it would not establish a causal link between his termination via the April RIF and his protected activity in August 1997. *See Green,* 652 A.2d at 45. Moreover, there would be no causal link between the April 14, 1999, letter and the decision to terminate McFarland's position, whether in April or in November.

Judge Dixon's order was simply a limitation on the admission of evidence at trial. Evidentiary rulings are within the

trial court's sound discretion, and we will upset them "only upon a showing of grave abuse." *Brown v. United States,* 763 A.2d 1137, 1139 (D.C.2000) (quoting *Taylor v. United States,* 661 A.2d 636, 643 (D.C. 1995)). Here, Mr. McFarland was able to offer evidence of the facts surrounding the RIF within CEEP, from April 1999 through October 1999. That latitude was sufficient to explore GW's intent in eliminating McFarland's position, and he has not explained how evidence about the operations of other parts of the university would have illuminated that issue. Judge Dixon's order merely precluded Mr. McFarland from offering evidence of dubious relevance to the central issue of retaliatory intent. His ruling, which strikes us as eminently sensible, was not a "grave abuse" of discretion. *Brown,* 763 A.2d at 1139.

## V. Conclusion

We affirm Judge Zeldon's grant of summary judgment to GW on Mr. McFarland's claims of race discrimination and gender discrimination. We also affirm Judge Dixon's grant of GW's motion for judgment as a matter of law on Mr. McFarland's claim of retaliation. The judgment of the Superior Court is hereby

*Affirmed.*